UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------

DAVID BAGNER,

                      Plaintiff,

    vs

UNITED STATES OF AMERICA,

                      Defendant.

-----------------------------------------        1:05-CV-512

UNITED STATES OF AMERICA,

                Third-party Plaintiff,

    vs

EMILY HART,

                Third-party Defendant.

---------------------------------------

| APPEARANCES: | OF COUNSEL: |
|---|---|
| FINKELSTEIN & PARTNERS, LLP<br>Attorneys for Plaintiff<br>436 Robinson Avenue<br>Newburgh, New York 12550 | GEORGE P. CONWAY, ESQ. |
| KREINDLER & KREINDLER<br>Attorneys for Plaintiff<br>18th Floor<br>100 Park Avenue<br>New York, New York  10017 | HILARY B. TAYLOR, ESQ.<br>PAUL S. EDELMAN, ESQ. |
| UNITED STATES DEPARTMENT OF JUSTICE<br>Attorney for Defendant and Third-party Plaintiff<br>P.O. Box 14271<br>Washington, DC 20044-4271 | RODNEY PATTON, ESQ. |

DAVID N. HURD
United States District Judge

## MEMORANDUM DECISION and ORDER

## I. INTRODUCTION

Plaintiff David Bagner ("plaintiff" or "Bagner") filed suit against the United States of America ("defendant") pursuant to the Suits in Admiralty Act, 42 U.S.C. § 741 ("SIAA"), alleging that the injuries he sustained in a jet ski accident were caused by the negligence of the Army Corps of Engineers ("Corps"). Specifically, he argues that the Corps was negligent by failing to provide adequate warning of the submerged dam located at the Troy Lock and Dam on the Hudson River, north of Albany, New York. Defendant added Emily Hart ("Hart), the driver of the jet ski at the time of the accident, as a third-party defendant.

Pursuant to Fed. R. Civ. P. 12(b)(1), defendant moves to dismiss for lack of subject matter jurisdiction, based upon the discretionary function exception in the SIAA. Plaintiff opposes.

Oral argument was heard on March 24, 2006, in Albany, New York. Decision was reserved.

## II. FACTS

The Corps maintains and operates the Troy Lock and Dam. Passage through this federally-operated lock and dam provides access into the New York State Canal System. The dam at Troy is submerged, and spans most of the width of the Hudson River. The lock is located on the east side of the river, with a 400-foot-long wall to the north, and a shorter one to the south, to guide traffic into the lock.

The federal lock is only operational during "navigation season," from May 1 through November 30 each year, as is the New York State Canal System. The Corps claims that it does not keep the Troy lock open year round because of inclement weather, debris,

high water on the river, lack of demand, and lack of funding. In short, it claims that the costs - of damage to the lock, damage to Corps' equipment, and danger to both the boaters and Corps' personnel operating in dangerous river conditions - outweigh any benefits there could be of keeping the lock open year-round.

As part of its duty in maintaining and operating the Troy Lock and Dam, the Corps is charged with warning mariners of dangers associated with the lock and dam. To facilitate uniformity and provide guidance regarding warning signs, the National Corps of Engineers developed a National Sign Program, which set forth its policies on "sign design, placement and use, management, maintenance, and economic considerations." (Docket No. 22, Def.'s Ex. 20, Stokes Aff. ¶ 4.) These policies are expressed in the Corps' Sign Standards Manual ("Manual"), which established standard guidelines for the use of signs that communicated information to the public. Each Corps field office must be in compliance with the Manual.

Section 14 of the Manual addresses lock, dam, and waterway signs. It identifies three basic sign types that should be used to identify specific areas or zones around a submerged dam: (1) A "Warning" sign, "used to notify boaters traveling upstream and downstream that they are approaching a dam. This is the first advisory warning that boaters will see." (Docket No. 22, Def.'s Ex. 17, Manual at § 14.10); (2) A "Danger: Submerged Dam 0000 Ft. Ahead" sign, "used to inform boaters traveling upstream and downstream that a dam is a specific distance ahead . . . [but] [p]lacement of this [sign] may not be necessary at gated structures where the overall level of hazard may be sufficiently controlled by the restricted areas around the dam." Id. at §14.11; and (3) A "Restricted: No Boat Here to Dam" sign, used to identify the "designated restricted area above and below a dam, [which] must be delineated for approaching watercraft." Id. at § 14.12 (emphasis added).

In addition to delineating the types of signs that should be used to warn mariners of dams, the Manual also illustrates possible sign plans and safety zone configurations. See e.g., id. at §§ 14.2, 14.4.  However, the Manual does not specify the exact number of signs that must be used at each site, nor does it mandate location placement for every site.  Instead, the Manual states that:

> [t]he actual signs used at the projects will depend on the type of the facility and local conditions . . .
>
> Extreme care should be taken to specify the correct sign, legend and size, and place these signs following the guidelines and specifications in this section.  For the program to be successful, it is imperative that the viewer have every possible chance to read and heed the signs to help avoid potential accidents.
>
> General sign placement guidelines are provided on page 14.44 through 14.48.  These are provided to illustrate the rationale of the system but are not intended to be implemented without a review.  Existing conditions must be evaluated on a site-by-site basis, followed by the development of a sign plan, using the signs and engineering criteria contained in this section.  Lock, dam, and waterway sign plans are to be submitted to the designated Sign Program Manager for review and approval.

Id. at § 14.1.  In a clarification memorandum to its district offices, the National Corps office emphasized that the Manual

> provides guidance on sign placement and that the diagrams show ideal sign placement in standardized situations.  The sign program allows for flexibility in sign placement at actual project sites, provided that the choices made are based on sound and reasonable professional judgment and that there is written justification in the sign plan.

(Docket No. 22, Def.'s Ex. 21 at 1.)

Additionally, in the Manual, the Corps specified that its sign system "is intended to complement the United States Coast Guard (USCG) Aids to Navigation and is not intended to be a substitute for the USCG system." Id. at 2.  In addition to Corps signage, some federal

sites utilized Coast Guard safety marking devices, such as buoys and daymarks, to mark, among other things, restricted areas. Id. In the aforementioned clarification memorandum, the Corps stated that "using a prominent line of appropriately marked buoys to block a restricted area may lessen or eliminate the need for large signs warning boaters to keep out."[1] Id. However, the memorandum went on to state, in bolded print, that:

> [i]t is critical to the safety of the boating public, if the District decides to go with buoying and daymarking of a submerged/fixed dam with lock, that the District also develop an aggressive educational program, as the danger associated with this type of structure is not readily apparent. A district committed to this type of signage must also be committed to expending the required resources to provide the necessary public education.

Id. (emphasis in original).

As a result of the new sign plan, the Corps' Albany Field Office submitted and implemented the following warning system for the area above the submerged dam and lock at Troy:[2] A "Warning" sign on the 112th Street Bridge 1.3 miles north of the dam,[3] a sign on the lock wall directing boat traffic to the lock, and restricted area buoys maintained by the USCG during the navigation season.[4] Additionally, charts, navigation bulletins, and other

---

[1] Indeed, the Corps sent out a supplementary instructional memorandum to its' district offices stating that in keeping with the intent that the Sign Standards Program complement the USCG Aids to Navigation, and not be a substitute for the USCG system, "it is the policy of the Corps of Engineers that restricted areas and other hazards at our locks and dams . . . may use a combination of daymarks and marking buoys as the primary marking system." (Docket No. 22, Def.'s Ex. 22 at 1.)

[2] Additional signs and buoys were placed below the dam, but it is not necessary to delineate those warning devices for the purpose of this motion.

[3] The sign reads: "Warning Submerged Dam 1.3 Miles Ahead Lock on East." (Docket No. 22, Def.'s Ex. 7).

[4] William Petronis, Chief of the Corps' Albany Field Office, determined that the USCG restricted area buoys are to be installed only during navigation season, roughly from May 1 to December 1. In his deposition, he stated that he does not have the buoys installed before the navigation season because river conditions, such as ice and high water, may harm the buoys if they are left out year-round. (Docket
(continued...)

documents available to the public illustrate the location of the submerged dam and warn the public of the dangers of dams.

There are no "danger" or "restricted area" signs north of the dam. When he designed the Sign Plan for the Troy Lock and Dam, Richard Campbell ("Campbell"), the Corps' Albany District Sign Manager, did not choose to add any other signs near the dam because he considered that any benefits to boaters would be outweighed by the costs involved in maintaining them.[5] Thus, the only restricted area designations at the submerged dam at Troy were the buoys in place from approximately May 1 to November 30; from approximately December 1 to April 30, there are no signs and/or buoys (other than the sign on the 112th Street Bridge, 1.3 miles north of the dam) to alert mariners of the danger at the submerged dam.

On April 29, 2004, plaintiff met Hart and friends at a house south of the 112th Street Bridge on the bank of the Hudson River near the Troy Lock and Dam.[6] He accepted a ride on a jet ski driven by Hart. As there were no other "warning," "danger," or "restricted area" signs posted after the 112th Street Bridge, and the restricted area buoys were not yet in

---

[4](...continued)
No. 22, Def.'s Ex. 1 at 59-60.) Furthermore, Petronis stated that he chooses not to put the restricted area buoys out in April because at that time, the Corps' first priority is to get the lock cleared of debris and ready to open. Id. at 66-67.

[5] Campbell considered both placing signs along the river bank and placing signs in the middle of the river on pylons, but dismissed both possibilities. He determined that placing signs along the river bank would be costly, as it would require the Corps to purchase the private property where the signs would be placed, in addition to trimming the trees around the signs to keep them visible. (Docket No. 22, Def.s' Ex. 25, Campbell Aff. ¶ 5.) He also concluded that placing signs in the river on pylons would obstruct navigation and involve significant construction and maintenance costs. Id. ¶ 6. Finally, Campbell chose not to place a "danger" or "restricted area" sign on the lock itself, because he thought such a sign would "confuse rather than help boaters." Id. ¶ 7.

[6] Oddly enough, there is also a marina south of the 112th Street Bridge, where boaters regularly launch boats into the Hudson River. (See Docket No. 23, Pl.'s Ex. 4.)

place, there was nothing to warn the pair of the dangerous submerged dam ahead.[7] The submerged dam at Troy is actually a spillway, and Bagner claimed that the water appeared to flow in a continuous stream. (See e.g., Docket No. 23, Pl.'s Ex. 3; Docket No. 25, Bagner Aff. ¶ 2.) The jet ski carrying Bagner and Hart went over the dam, and Bagner's legs were severely injured.

Plaintiff alleges, inter alia, that his injuries were caused by the Corps' negligent warning of the danger of the submerged dam. Defendant filed a third-party complaint against Hart for contribution.

## III. DISCUSSION

Pursuant to Fed. R. Civ. P. 12(b)(1), defendant moves to dismiss for lack of subject matter jurisdiction. Specifically, the Corps argues that the challenged conduct - the placement of warning signs and/or buoys - falls within the discretionary function exception in the SIAA. Bagner opposes.

### A. Motion to Dismiss Standard

When assessing a motion to dismiss for lack of subject matter jurisdiction, a court must "accept as true all material factual allegations in the complaint." Shipping Fin. Serv. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citing Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974)). However, the court must refrain from "drawing from the pleadings inferences favorable to the party asserting [jurisdiction]." Id. (citing Norton v. Larney, 266 U.S. 511, 515, 45 S. Ct. 145, 147 (1925)). Courts deciding Rule 12(b)(1)

---

[7] Bagner did not consult any publication regarding the Hudson River or the Troy Lock and Dam before accepting a ride on the jet ski with Hart. (Docket No. 22, Def.'s Ex. 30, Pl.'s Answers to Interrogs., No. 23.)

motions "may resolve the disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits." Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000).  The party asserting that the court has subject matter jurisdiction bears the burden of proving the court's jurisdiction.  FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S. Ct. 596, 608 (1990); Overton v. New York State Div. of Military & Naval Affairs, 373 F.3d 83, 93 (2d Cir. 2004).

### B. Discretionary Function Exception

Bagner filed suit pursuant to the SIAA, 46 U.S.C. § 741, which waives the United States' sovereign immunity and authorizes certain suits in admiralty which could be maintained if the claim were brought against a private party.  See 42 U.S.C. § 742; Saint John Marine Co. v. United States, 92 F.3d 39, 43-44 (2d Cir. 1989).  While the SIAA "contains no express exception for discretionary functions," the discretionary function exception is implied within the SIAA.  In re Joint Eastern & Southern Dists. Asbestos Litig., 891 F.2d 31, 34-35 (2d Cir. 1989).

The discretionary function exception, articulated within the Federal Tort Claims Act, 28 U.S.C. § 1346(b), provides that the United States shall not be liable for "[a]ny claim . . . based on the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  Berkovitz v. United States, 486 U.S. 531, 536, 108 S. Ct. 1954, 1958 (1988) (quoting United States v. Varig Airlines, 467 U.S. 797, 808, 104 S. Ct. 2755, 2761-62 (1984)).

Analysis of the discretionary function exception requires a two-part inquiry. First, the court must determine whether the challenged conduct was "discretionary in nature" - i.e., whether it was an act that "involves an element of judgment or choice." United States v. Gaubert, 499 U.S. 315, 322, 111 S. Ct. 1267, 1273 (1991) (quoting Berkovitz, 486 U.S. at 536, 108 S. Ct. at 1959); see also McMellon v. United States, 395 F. Supp. 2d 422, 428 (S.D. W. Va. 2005). "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" Id. (quoting Berkovitz, 486 U.S. at 536, 108 S. Ct. at 1958-59). Governmental policy may be "expressed or implied by statute, regulation or agency guidelines," both internal and published. Id. at 324, 111 S. Ct. at 1274; Andrulonis v. United States, 952 F.2d 652, 654-55 (2d Cir. 1991). Accordingly, "if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected;" however, "[i]f the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." Gaubert, 499 U.S. at 324, 111 S. Ct. at 1174 (citing Dalehite v. United States, 346 U.S. 15, 36, 73 S. Ct. 956, 968 (1953)).

Second, if the challenged conduct is discretionary, the court must determine whether the exercise of discretion "is of the kind that the discretionary function exception was designed to shield." Berkovitz, 486 U.S. at 536, 108 S. Ct. at 1959. The purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political police through the medium of an action in tort," Varig Airlines, 467 U.S. at 814, 104 S. Ct. at 2765; thus, "when properly construed, the exception 'protects only governmental actions and decisions based on considerations of

public policy,'" Gaubert, 499 U.S. at 323, 111 S. Ct. at 1273-74 (quoting Berkovitz, 486 U.S. at 537, 108 S. Ct. at 1959).  Regulations that allow the governmental employee to exercise discretion "create[ ] a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." Id. at 324, 111 S. Ct. at 1274.

Therefore, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at 324, 111 S. Ct. at 1274.  To survive a motion to dismiss, a claim "must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." Id. at 324-25, 111 S. Ct. at 1274-75; see also McMellon, 395 F. Supp. 2d at 429.  The court's focus is "not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." Id. at 325, 111 S. Ct. at 1175.

In McMellon, the plaintiffs were injured when their personal water crafts went over the Robert C. Byrd Locks and Dam on the Ohio River.  395 F. Supp. 2d at 425.  The Corps operated the dam, and in 1993 had installed warning buoys on the upstream side of the dam; however, the buoys were removed in 1995 after the Corps decided they posed a safety risk. Id.  At the time the plaintiffs traveled towards the dam, there were warning signs posted along the river, but plaintiffs were traveling in the middle of the river and did not see the signs posted on the river bank.  Id.  They sued the Corps under the SIAA, and the Corps claimed that the discretionary function exception rendered them immune from liability.  Id. at 427.

The McMellon court found that the Corps was bound by statute to place warning signs in "conspicuous and appropriate places upstream from all locks and dams."[8] Id. at 429. The court found that the language of the statute "suggests that each dam should have a restricted area, the limits of which are to be determined by the District Engineer." Id. at 430. Thus, while the "range of the restricted area around the dam is clearly a discretionary decision," the "decision to designate a restricted area upstream from the dam, and/or to erect signs or flashing lights marking the restricted area, is not discretionary."[9] Id.

### a. Element of Judgment or Choice

In this case, the Corps argues that the challenged conduct - namely its alleged failure to erect more warning signs and alleged failure to install year-round, rather than seasonal, navigation aids immediately north of the Troy Lock and Dam - falls within the discretionary function exception implicit in the SIAA. It claims that while the Manual does delineate three types of signs that can be erected near locks and submerged dams, each field office has the discretion to determine whether they will install all three sign types and if

---

[8] Specifically:

> All waters immediately above and below each dam, as posted by the respective District Engineers, are hereby designated as restricted areas. No vessel or other floating craft shall enter any such restricted area at any time. The limits of the restricted areas at each dam will be determined by the responsible District Engineer and marked by signs and/or flashing red lights installed in conspicuous and appropriate places.

33 C.F.R. §207.300(s) (2002).

[9] The McMellon court also noted the Corps' creation of the sign standards Manual. 395 F. Supp. 2d at 430. Although compliance with the Manual was not required at the time of the McMellon plaintiffs' accident, the court found that the Manual's "existence supports the finding that the regulation was not intended to allow a government actor discretion in determining the appropriate size and prominence of warning signs." Id.

they choose to install signs, where those signs will be located.[10]  Therefore, according to defendant, the Manual instills each field office with discretion to place all - or none - of the signs at a site; it does not mandate that certain signs must be placed at certain locations.

The Corps maintain that Campbell and the Albany Field Office responsible for the signage at the submerged dam at Troy were well within their discretion when determining not to install additional signs at the dam and choosing to rely only on the USCG seasonal warning buoys to warn boaters of the submerged dam.  Thus, defendant alleges that the first prong of the discretionary function exception has been met.

Defendant is correct in that it does have some element of discretion in placing the signs in accordance with the Manual.  The Manual makes clear that "[e]xisting conditions must be evaluated on a site-by-site basis," and that "[t]he actual signs used at the projects will depend on the type of the facility and local conditions."  (Docket No. 22, Def.'s Ex. 17, Manual at § 14.1.)  However, upon further examination of the Manual, while the Corps does have discretion in the location of the placement of certain signs, that discretion does not extend to the placement of the all the signs.  See e.g., McMellon, 395 F. Supp. 2d at 430.

According to the Manual, the "Warning: Submerged Dam Ahead" sign "is the first advisory warning that boaters will see."  Id. at § 14.10 (emphasis added).  Designating that this will be the "first" sign implies that there will be additional signs . . . Here, the Corps

---

[10] An "agency's interpretation of . . . its own regulations is entitled to 'substantial deference,'" Ramsameachire v. Ashcroft, 357 F.3d 169, 178 (2d Cir. 1994) (quoting Chevron USA v. Natural Res. Def. Council, 467 U.S. 837, 843, 104 S. Ct. 2778, 2782 (1984), but only if that interpretation is not "clearly erroneous," Kelly v. United States, 924 F.2d 355, 361 (2d Cir. 1991); Sanchez v. Bellefeuille, 855 F. Supp. 587, 592 (N.D.N.Y. 1994)).

placed a "Warning Submerged Dam Ahead 1.3 Miles Lock on East" sign at the 112th Street bridge, 1.3 miles north of the submerged dam - but placed no additional signs thereafter.[11]

Looking to the second possible sign the Manual describes for warning of a submerged dam, the "Danger: Submerged Dam 0000 Ft. Ahead" sign, the Manual articulates that "[p]lacement of this level of notification *may not be necessary* at gated structures where the overall level of hazard may be sufficiently controlled by the restricted areas around the dam." Id. at § 14.11 (emphasis added). Unlike the "Warning" sign *supra*, or the "Restricted Area" sign infra, the Manual specifically states that this sign may not be necessary if the warnings around the restricted area sufficiently warn boaters of the danger ahead. Thus, it would be in the discretion of each field office as to whether this type of sign would be utilized.

The final, and arguably most important, sign discussed in the Manual is the "Restricted: No Boats Here to Dam" sign. The Manual clearly and unequivocally states that "[t]he designated restricted area above and below a dam *must be delineated* for approaching watercraft." Id. at § 14.12 (emphasis added). While a subsequent memorandum from the Corps' headquarters has clarified that "using a prominent line of appropriately marked buoys to block a restricted area may lessen or eliminate the need for large signs warning boaters to keep out," neither the memorandum nor the Manual discuss "seasonal" warnings of the restricted area immediately above a submerged dam. (Docket No. 22, Def.'s Ex. 21 at 2.) Indeed, the memorandum emphasizes in bolded lettering that if a "District decides to go with buoying and daymarking of a submerged/fixed dam with lock, that the District also develop

---

[11] While defendant may have been within its discretion to only erect one warning sign, defendants' reasoning is questionable given that there is a marina where people regularly launch their boats south of the only warning sign. Thus, those that enter the waterway at the marina or any other location south of the 112th Street bridge, such as Bagner and Hart, have no signed warning of the upcoming danger.

- 13 -

an aggressive educational program, as the danger associated with this type of structure is not readily apparent." Id. (emphasis in original).

At the Troy Lock and Dam, defendants chose to rely only on the USCG buoys to designate the restricted area above the submerged dam, which were only in place from approximately May 1 to November 30.  From December 1 to approximately April 30, *there was no warning - sign, buoy, or otherwise - physically marking the restricted area*.  The Manual says that the restricted area must be delineated, either with signs or buoys.  It does not say that the restricted area only has to be delineated during the spring and summer.  It does not say that the restricted area only has to be delineated during the "season."  There is no room for discretion in this instance - the Manual specifically and unequivocally states that the restricted area must be delineated . . . and from approximately December 1 to April 30, defendant did not delineate the restricted area at the Troy Lock and Dam.[12]

Similar to McMellon, defendant had the discretion to choose the location and total number of signs at or near the submerged dam, but it did not have the discretion to choose to not place signs at or near the restricted area *at all*.[13]  See McMellon, 395 F. Supp. 2d at 430.  While defendant's choice to rely only on the USCG buoys during the "season" was

---

[12] The defendant argues that it had discretion to make seasonal adjustments.  This is true.  It had discretion to remove the buoys during the "off-season."  It did not have discretion to remove the buoys and leave the restricted area without any warning designation during the "off-season."

[13] Defendant attempts to distinguish McMellon by claiming that the regulation applicable in that case, 33 C.F.R. § 207.300(s), is applicable only to the Ohio River, the Mississippi River, and their tributaries, not to the Hudson River. (See Docket No. 26, Def.'s Reply to Pl.'s Opp. Mem. at 6.) However, McMellon is analogous in this case because the regulation at issue, indicative of a federal policy, mandated the placement of conspicuous warning signs. See McMellon, 395 F. Supp. 2d at 429. Here, too, there is a federal policy mandating the placement of warning signs (and/or buoys) - the Manual.  Under Berkovitz and its progeny, violation of a federal statute, regulation, or policy renders the discretionary function exception inapplicable.  See e.g., 486 U.S. at 536, 108 S. Ct. at 1958-59.  Thus, this case is analogous to McMellon in that in both cases there was a federal policy mandating certain conduct - and in both cases, the Corps violated that policy.

permissible under the Manual, its decision to forego all signs and/or buoys in the off-season was not.[14]

Because the Manual specifically required that the restricted area be delineated, there was no element of judgment or choice in defendant's choice to not mark the restricted area of the submerged dam at Troy during the off-season. See Berkovitz, 486 U.S. at 536, 111 S. Ct. at 1958-59. Thus, there is no shelter from liability for plaintiff's injuries, which occurred on April 29, 2004, at a time when the restricted area was not delineated by either buoys or signs. As such, the discretionary function exception will not apply.

### b. Susceptible to Policy Analysis

The discretionary function exception operates to protect government employees that follow statutes, regulations, or other policies that mandate particular conduct; when "the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." Gaubert, 499 U.S. at 324, 111 S. Ct. at 1274. "If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to public policy." Id.

Here, the Corps violated the Manual's specific direction to delineate the restricted area above the submerged dam at Troy. Because the Manual was a specific federal policy mandating that the restricted area above a submerged dam be delineated for mariners, there is no need to analyze whether defendant's decision was in furtherance of public policy.

---

[14] Defendant did have an acceptable public education program in place, consisting of charts, navigation bulletins from both the Corps and the USCG, and other publicly available documents informing the public of the submerged dam's location and its dangers. Realistically, though regrettably, not everyone that enters the Hudson River near Troy will have read these advisory warnings. It is precisely for these people that the buoys and/or signs are vital.

## IV. **CONCLUSION**

The Corps did not have the discretion to determine that no warning signs and/or buoys were necessary in the restricted area above the Troy Lock and Dam during the off-season, from December 1 to approximately May 1. In only providing buoys for seven months of the year, it acted in contravention of the United States Army Corps of Engineers Sign Standards Manual. Thus, defendant is not protected by the discretionary function exception.

Because the discretionary function exception does not apply, subject matter jurisdiction exists pursuant to the Suits in Admiralty Act, 46 U.S.C. § 741.

Therefore, it is

ORDERED that

1. The defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) is DENIED; and

2. The defendant shall file and serve an answer on or before May 15, 2006.

IT IS SO ORDERED.

Dated: May 1, 2006
Utica, New York.

United States District Judge